**KENT JENKINS SALES,
INC., Appellant,**

v.

**ANGELO BROTHERS
COMPANY, Appellee.**

No. 85–2411.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1986.

Decided Nov. 3, 1986.

John C. Everett, Prairie Grove, Ark., for appellant.

Stephen Lee Wood, Rogers, Ark., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and REGAN,* Senior District Judge.

HEANEY, Circuit Judge.

Kent Jenkins Sales, Inc., appeals the district court's judgment in favor of Angelo Brothers Company in this diversity suit alleging breach of an employment contract and violation of the Arkansas Franchise Practices Act, Ark.Stat.Ann. §§ 70–807 to –818 (Repl.1979). The district court granted a directed verdict at the close of plaintiff's evidence. For reversal, appellant argues that the district court erred in holding as a matter of law 1) that there was insufficient evidence to submit to the jury on the breach of contract theory, and 2) that the Arkansas Franchise Practices Act did not apply to Kent Jenkins Sales, Inc. For the reasons set forth below, we affirm in part, reverse in part, and remand.

## BACKGROUND

Kent Jenkins Sales, Inc. is owned and operated by Kent Jenkins (Jenkins). Jenkins, a manufacturer's representative, represented various companies to mass merchandise retailers in Arkansas and Louisiana. Wal-Mart Stores, a large chain of general merchandise stores, was one of Jenkins' biggest customers.

In 1979, Jenkins was representing the Holzgang Company, a supplier of lamp parts and replacement glass for light fixtures. Jenkins had been selling this particular line of products to Wal-Mart Stores for several years. In 1979, Angelo Brothers Company (Angelo) bought the Holzgang Company, and then asked Kent Jenkins to work for them as a manufacturer's representative. He was somewhat apprehensive about working for Angelo because he believed that the company "had a history of changing salesmen a lot[.]" T.R. 57. William Miller, Angelo's national sales manager, assured Jenkins that the company had salesmen who had been with them for twenty-two years. Jenkins agreed to represent Angelo for a 6½% commission. He asked for a written contract, but he never received one. He did receive a letter from Miller, dated December 10, 1979, in which Angelo promised to pay him a 6½% commission on all the accounts in his territory. The letter did not specify any other terms of the agreement, but it purported to "satisfy any apprehension you may have of any deals being changed on you."[1]

Jenkins began representing Angelo in Arkansas and with one chain of stores, Howard Stores, in Louisiana. Wal-Mart bought the replacement glass and lamp parts line from Angelo after Jenkins made a sales presentation to them. Jenkins received commissions on the original order

---

* The Honorable John K. Regan, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

1. Kent Jenkins
   52 Wildwood Drive
   Rogers, Arkansas 72756

   Dear Kent:
   To confirm our phone conversation of Monday, December 10. It is understood that our company will pay you a commission rate of 6½% on all of the accounts in your territory.
   This letter should satisfy any apprehension you may have of any deals being changed on you. I apologize for the aggravation you've gone through since we've acquired the Holzgang Products Company.
   Our company is a very straight and upfront company and I can assure you from this day on you'll have no further troubles along these lines. Looking forward to meeting with you sometime in January in Texas.
   Sincerely,
   "Bill"
   William Miller,
   National Sales Manager

and all automatic reorders of the line [2] until the end of 1983. From 17% to 10% of Kent Jenkins Sales, Inc.'s total commission income came from Angelo during those years. In 1983, its income from Angelo was about $50,000. In January of 1984, Jenkins made several major sales presentations to Wal-Mart when its buyers reviewed the replacement glass line and compared it to those of other manufacturers. Wal-Mart decided to continue buying from Angelo after this review, and Jenkins again received commissions on the sales, including automatic reorders.

Jenkins also represented Prestige Lighting, a direct competitor of Angelo. Prestige manufactured lighting fixtures and a replacement glass line, and Jenkins had sold the Prestige line of lighting fixtures to Wal-Mart. In August of 1983, Angelo added lighting fixtures to its line of products. In October, 1983, Jenkins made a sales presentation of Angelo's lighting fixtures to Wal-Mart, but Wal-Mart decided to continue buying the Prestige line rather than switch to Angelo. There was testimony that if a retailer decided to change suppliers, the new supplier generally would have to buy out the retailer's entire inventory of the old supplier's products. In the case of a large chain store such as Wal-Mart, the inventory would be very expensive. If a switch had been made, Jenkins would have lost the commissions from the Prestige line, and the commissions from Angelo would at first be drastically reduced because Angelo would have to reimburse Wal-Mart for the Prestige inventory.

In July, 1984, Angelo fired Jenkins as its representative. It continued to pay him commissions on reorders through September, 1984, but then stopped paying him. No representative has been hired to replace Jenkins, so Angelo is not paying commissions to anyone on his accounts. The reason given for the termination was that Jenkins also represented Prestige Lighting and had refused to resign from that employer. Jenkins had represented Prestige since before Angelo hired him, and Angelo was aware of this. Until August, 1983, however, Angelo did not sell complete lighting fixtures; it only sold replacement glass for the fixtures. Testimony indicated that the fixtures themselves are considered a different product line. John Stephenson, Angelo's southern regional sales manager, testified that when Angelo sold replacement glass, it did not consider Prestige a major competitor because Prestige's replacement glass was only for its own products, but when Angelo began selling lighting fixtures, it considered itself to be in direct competition with Prestige's line of fixtures. He also testified that Jenkins was an excellent representative. Jenkins presented testimony from the manufacturer's representatives that it was common in the business to represent more than one manufacturer that sold the same or similar products.

In May, 1985, Jenkins brought this diversity suit against Angelo, claiming that Angelo had breached the contract between the two parties, depriving Jenkins of commissions that he was due, and that the Arkansas Franchise Practices Act had been violated because Jenkins' "franchise" had been terminated without good cause. The case was tried before a jury, but after plaintiff's case in chief, the district court granted a directed verdict for defendant Angelo. The court did not issue a written opinion, but explained its decision in court. It reasoned that the Arkansas Franchise Practices Act did not apply to the relationship between these parties. It also held that the parties did have a valid express

2. There was testimony that the usual practice of Wal-Mart and other large retailers was to conduct a review of each product line every few years in order to decide whether to continue with the same supplier or to change to a different one. Between reviews there was little chance that a change would be made unless there was a major catastrophe, such as bankruptcy of the manufacturer or destruction of a warehouse. Products were generally reordered automatically directly from the manufacturer, but the representative was expected to be continually available to solve problems and suggest ways to sell more.

contract, but the only terms of the contract were that Angelo would pay Jenkins a 6½% commission on sales he made for them. There were no terms relating to the length of employment or whether Jenkins could be terminated without cause, nor was there anything in the contract about whether or how commissions would be paid after Jenkins quit as Angelo's representative. The court held that because there was an express contract, a recovery under a quasi contract or unjust enrichment theory was not available.

## ANALYSIS

In reviewing a directed verdict, we must determine whether the evidence was sufficient to create an issue of fact for the jury. *Greenwood v. Dittmer*, 776 F.2d 785, 788 (8th Cir.1985). In doing so, we view the evidence in the light most favorable to the non-moving party, and give that party the benefit of all reasonable inferences from the evidence. *Id.* In this case, the district court found that "there was nothing to ask the jury" on any of the claims made by Kent Jenkins.

### 1. Implied in Fact Contract

The existence of a contract is a question of fact for the jury. *Robertson v. Ceola*, 255 Ark. 703, 705, 501 S.W.2d 764, 766 (1973). The construction and legal effect of a contract are for the court to decide as a matter of law, but if the meaning of the contract depends on disputed extrinsic evidence, then the jury must make a determination. *Arkansas Rock & Gravel Co. v. Chris-T-Emulsion Co.*, 259 Ark. 807, 809, 536 S.W.2d 724, 726 (1976). Jenkins argues that certain terms can be implied in fact in this contract and that the evidence was sufficient for submission to the jury. Jenkins asserts that the course of conduct between these parties, the custom of the manufacturer's representative trade, the communications between the parties, and the performance by Jenkins are sufficient to indicate an implied contract between these parties which included the following terms: 1) that Jenkins would not be terminated by Angelo without good cause, and 2)

that even after his termination, Jenkins would continue to be paid commissions on reorders resulting from orders that he had originally solicited.

### A. Termination at Will

Under Arkansas law, if there is no definite term specified in the contract, an employment contract is considered to be terminable at will by either party. *Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285, 295 (8th Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *Newton v. Brown & Root*, 280 Ark. 337, 338, 658 S.W.2d 370, 371 (1983). The trial court found that the December 10, 1979, letter and jenkins's testimony at trial established as a matter of law that the parties intended to and did enter into an agreement that Jenkins would work for Angelo as a manufacturer's representative and Angelo would pay him commissions in return. But, because the parties did not specify the duration of the contract in their agreement, the court held as a matter of law that their agreement was terminable at will. In our view, the court erred in so holding.

■ Angelo knew that Jenkins did not want to work for it because the company had a history of frequently changing salesmen. But, in order to employ Jenkins, a salesman with a fine reputation, Angelo's national sales manager assured Jenkins that the company had salesmen who had been with them for twenty-two years. Jenkins asked for a written contract, but instead received from Angelo a letter "to satisfy any apprehension you may have of any deals being changed on you." This evidence is more than sufficient to create a jury question of whether Angelo agreed to fire Jenkins only for good cause. Thus, the trial court erred in not submitting this question to the jury.

### B. Commissions after Termination

Appellant also argues that there was an implied agreement to pay commissions to Jenkins on all reorders that were a result of his initial efforts to get a particular line in a store. John Stephenson, Angelo's

southern regional sales manager, was asked:

Q: Now, against the background of your experience in the business and with respect to your reps who are now your reps and haved always been your reps, do you pay a commission on those re-orders, those automatic reorders?

A: A rep gets a commission for all sales whether they are initial, re-order, or whatever.

Q: * * * Does that include automatic re-orders?

A: Yes sir.

T. p. 262.

He was also asked:

Q: Do you, Mr. Stephenson, with the benefit of hindsight, give Mr. Jenkins credit for the sales you're making Wal-Mart Stores as we speak today?

A: Very much so.

T. p. 271–72.

■ In our view, this testimony is more than sufficient evidence from which the jury could determine that Angelo had specifically agreed to pay Jenkins a sales commission on reorders, and the district court erred in taking this issue from the jury.

C. *Arkansas Franchise Practices Act*

Jenkins's next contention is that the district court erred in determining that he did not have a cause of action based on the Arkansas Franchise Practices Act. The Arkansas Franchise Practices Act, Ark. Stat.Ann. §§ 70–807 to –818 (Repl.1979) provides for recovery of damages and attorneys' fees from franchisors who violate the Act by terminating a franchise without good cause or without proper notice. The Act was passed in 1977, but the Arkansas courts have not decided any cases which interpret the scope of the Act.[3] The dis-

---

3. The definitional sectional of the Act includes the following:

(a) "Franchise" means a written or oral agreement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trademark, service mark or related characteristic within an exclusive territory, or to sell or distribute goods or services, within an exclusive territory, at wholesale, retail, by lease agreement or otherwise.

    *    *    *    *    *    *

(f) "Place of business" means a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sales and sells the franchisor's services.

Ark.Stat.Ann. § 70–808 (Repl.1979).

Other relevent sections of the statute are:

70–809. Application of Act.—This Act [§§ 70–807—70–818] applies only to a franchise or franchises entered into, renewed or transferred after the effective date [March 4, 1977] of the Act, the performance of which contemplates or required [requires] the franchisee to establish or maintain a place of business within the State of Arkansas * * *.

70–810. Termination, cancellation or failure to renew—When—Violations—It shall be a violation of this Act [§§ 70–807—70–818] for a franchisor to: (a) terminate or cancel a franchise without good cause, or (b) fail to renew a franchise except for good cause, or except in accordance with the current policies, practices, and standards established by the franchisor which in their establishment, operation or application, are not arbitrary or capricious. [Acts 1977, No. 355, § 4, p. 584.]

70–811. Notice requirement—When applicable—Rectificaiton.—No franchisor shall directly or indirectly terminate, cancel or fail to renew a franchise without first giving written notice to the franchisee at least ninety (90) days in advance of such action, setting forth the reasons for such termination, cancellation or intention not to renew, and, in the case of terminations, shall provide the franchisee with thirty (30) days in which to rectify any claimed deficiency. The notice provisions of this Section shall not apply where the reason for termination or cancellation is good cause * * *.

70–815. Re-purchase upon unfair termination.—Upon termination of any franchise by a franchisor without good cause, the franchisor shall at the franchisee's option, re-purchase at franchisee's net cost less a reasonable allowance for depreciation or obsolescence [obsolescence], the franchisee's inventory, supplies, equipment and furnishings purchased by the franchisee from the franchisor or its approved sources; provided no compensation shall be allowed for the personalized items which have no value to the franchisor. [Acts 1977, No. 355 § 9, p. 584.]

70–816. Franchisee's remedies.—Any franchisee which [who] is harmed by a violation or violations of Section 8 [§ 70–814] of this Act shall be entitled to recover treble damages in a civil action and where appropriate, obtain injunctive relief, in addition to reasonable attorney's fees and costs of litigation. Any franchisee which [who] is harmed by a

trict court relied on two cases holding that the Wisconsin Fair Dealership Act, which has language quite similar to the Arkansas Act, did not apply to manufacturer's representatives. *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60, 66–67 (1981); *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262, 266 (7th Cir.1983); *See also E.A. Dickinson & Associates, Inc. v. Simpson Electric Co.*, 509 F.Supp. 1241, 1244 (E.D.Wis.1981). While recognizing that these decisions are not controlling in this case, the court found their logic persuasive. A franchisee normally has to pay a franchise fee, buy and keep an inventory of the franchisor's products, and pay for advertising those products and/or pay an advertising fee to the franchisor. Appellant argues that Kent Jenkins Sales, Inc. had the right to sell Angelo's goods within an exclusive territory, and therefore it clearly and unambiguously comes within the definition of a franchise in section 70–808(a). The statute does not define "sell," but, as the Seventh Circuit noted in *Wilburn*, there is a distinction between selling and promoting sales. 719 F.2d at 265. Jenkins did not take title and possession of any of Angelo's products, *see Foerster*, 313 N.W.2d at 66, and although Jenkins had some authority to negotiate price, he did not have "an unqualified authorization to transfer the product at the point and moment of the agreement to sell." *Wilburn*, 719 F.2d at 265, (quoting *Foerster*, 313 N.W.2d at 64). Therefore, he would be considered a promoter or solicitor of sales rather than an actual seller of goods.

When the highest court in the state has not construed a statute which the federal court must apply, the federal court must determine what the highest state court would probably hold were it called upon to decide the issue. *Kifer v. Liberty Mutual Insurance Co.*, 777 F.2d 1325, 1329 (8th Cir.1985). When this court reviews such an issue, the interpretation of state law by a federal district judge sitting

in that forum is entitled to substantial deference unless it is "fundamentally deficient in analysis or otherwise lacking in reasoned authority." *Dabney v. Montgomery Ward & Co., Inc.*, 761 F.2d 494, 499 (8th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). The district court's construction of the statute, although not based on Arkansas precedents, is a reasonable one, and we accept it.

Reversed and remanded.

---

violation of any other Section of this Act [§§ 70–807—70–818] shall be entitled to recover actual damages in a civil action and, where appropriate, obtain injunctive relief, in addition to reasonable attorney's fees and costs of litigation. [Acts 1977, No. 355, § 10, p. 584.]